UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| PROSSER FERTILIZER & AGROTEC CO., LTD., <br><br> Plaintiff, <br><br> -against- <br><br> NITRON GROUP CORPORATION, <br><br> Defendant. | Civil Action No.: <br><br> **COMPLAINT** |

Plaintiff Prosser Fertilizer & Agrotec Co., Ltd. ("Prosser"), by its attorneys, Olshan Frome Wolosky LLP, for its Complaint against Nitron Group Corporation ("Nitron"), alleges as follows:

**The Parties**

1. Prosser and Nitron are both global traders of chemicals and agricultural fertilizers.

2. Prosser is a Belizean corporation with a principal place of business in Belize City, Belize.

3. Nitron is a Connecticut corporation with its principal place of business in Greenwich, Connecticut.

**Jurisdiction and Venue**

4. This Court has jurisdiction based on diversity of citizenship pursuant to 28 U.S.C. § 1332.

5. Venue in this judicial district is proper, pursuant to 28 U.S.C. § 1391(b)(1), because Nitron – the only defendant in this action – is a resident of this judicial district.

**Statement of the Relevant Facts**

6. In late 2017, Prosser desired to acquire large quantities of Ammonium Sulphate ("AMSUL") and Diammonium Phosphate ("DAP"), two chemicals used as fertilizers.

7. Towards that end, Prosser sought the assistance of non-party Fertilizer Corporation of America ("FCA") in trying to identify a seller that would be capable of shipping these products to Prosser.

8. FCA is headquartered in and carries on all of its business out of Miami, Florida.

9. On or about November 11, 2017, FCA – as Prosser's broker – entered into a Sales Contract with Nitron, pursuant to which Nitron would sell 2,000 metric tons of AMSUL and 1,250 metric tons of DAP and ship those materials to Belize City, where Prosser is located.[1]

10. Nitron was fully aware of the fact that Prosser was the ultimate purchaser of the AMSUL and DAP, that FCA was acting only as agent for Prosser, and that Nitron was required to ship the goods to Prosser in Belize.

11. The Sales Contract specified a price of $250.00 per metric ton of AMSUL and $395.00 per metric ton of DAP. The total price of the sale, therefore, would be $500,000.00 for the AMSUL and $493,750.00 for the DAP.

12. The Sales Contract provided that "[a]ll terms and conditions contained on the face and reverse side of the "CONGENBILL" Bill of Lading . . . shall apply to this Contract unless expressly provided otherwise or the contrary herein."

13. Normally, a purchaser in the international shipping industry pays only after the Bill of Lading is produced and it is notified of the exact quantity of the product actually loaded onto the vessel. Tomas Novak ("Novak"), Executive Vice President of Trading at Nitron,

---

[1] A copy of the Sales Contract is attached to this Complaint as Exhibit A.

2

however, insisted that Prosser, who Nitron knew was the customer, prepay the entire amounts for the purchases.

14.     Only because Prosser had worked with Nitron in the past, and due to Novak's insistence, Prosser acceded to this unusual request and agreed to prepay for the shipment.

15.     On December 13, 2017, Prosser, though FCA, prepaid to Nitron the full amount required by the Sales Contract.

16.     After the payment to Nitron, however, it became extremely difficult for Prosser to obtain any information from Nitron about the shipment.  In fact, Nitron never even notified FCA or Prosser as to whether the goods had been shipped.

17.     The sole communication that FCA or Prosser received from Nitron was a request from Nitron to divert the vessel to be used for the shipment to another port in order to accommodate another one of its customers.

18.     Only on December 27, 2017 – one day before the shipment was due to arrive in Belize City – did Prosser learn that Nitron had shipped the goods.  Prosser became aware of the shipment only because an agent for the MV Balsa 86 ship forwarded the Bill of Lading.

19.     The Bill of Lading listed Prosser as "Consignee" for the shipment.

20.     Prosser's address was also used as the Bill of Lading's "Notify Address".[2]

21.     Although Prosser had already prepaid Nitron for the materials, when it received the Bill of Lading it learned that Nitron had shipped only about half of the amounts of AMSUL and DAP for which it had already paid.

---

[2] The Bill of Lading is attached as Exhibit B.

22. Specifically, the Bill of Lading showed that only 600.131 metric tons of DAP (rather than the 1,250 metric tons specified in the Sales Contract) and 1,003.756 metric tons of AMSUL (and not the 2,000 metric tons specified in the Sales Contract) had been shipped.

23. The significant shortfalls in the quantities of the AMSUL and DAP were confirmed when the ship arrived in Belize City on December 28, 2017.

24. Based on the per metric ton prices listed in the Sales Contract, the value of the products delivered was $250,939.00 of AMSUL and $237,051.75 for DAP – for a total value of only $487,990.75. Thus, the difference between the amount that Prosser prepaid to Nitron and the value of the products it actually received was $505,759.25.

25. Upon information and belief, Nitron never provided Prosser with a Bill of Lading prior to payment, but instead demanded advance payment, because it knew that this document would unequivocally show – even before the shipment arrived – that there was a substantial shortfall.

26. Not only did Nitron fail to ship the appropriate amounts, but the products were of extremely poor quality.

27. Prosser immediately notified Nitron that the shipment was deficient. At 1:04 PM on December 28, 2017 – the date of the shipment – Prosser's director, Salvador Espat III ("Espat"), wrote an email to Novak demanding that the excess funds Prosser had prepaid to Nitron be returned.

28. On January 10, 2018, Espat wrote to Nitron (a) cancelling its purchase of the portions of the products that still had not been delivered, and (b) again demanding to be reimbursed.[3]

---

[3] A copy of this letter is attached as Exhibit C.

29. Along with that letter, Espat also sent Nitron a separate document outlining all of the amounts that it had prepaid contrasted with the value of the products it actually received.

30. Similarly, on January 26, 2018, FCA's president wrote to Nitron demanding a refund for the undelivered materials.[4]

31. Although Nitron is holding $505,759.25 in excess funds, it has failed to give Prosser any meaningful response to its requests for reimbursement, nor has it even indicated any plans to deliver the remaining portions of the materials.

32. Prosser and FCA have separately learned that – although they were the sole charters of the vessel – Nitron also shipped cargo thereon to one of Prosser's competitors. This conduct was extremely unethical, as it allowed Nitron to ship that cargo to one of Prosser's competitors free of cost and at Prosser's expense.

33. Based on the foregoing, Prosser has been damaged.

### First Claim
### (Third Party Beneficiary of Contract)

34. Prosser repeats and realleges the allegations set forth in paragraphs 1 through 33, above.

35. As described above, FCA entered into the Sales Contract with Nitron, as disclosed agent of Prosser.

36. FCA and Prosser have performed under the Sales Contract.

37. At all times, Nitron was aware of the fact that the Sales Contract was intended for Prosser's benefit, that Prosser was the ultimate purchaser of the products, that FCA was acting

---

[4] A copy of this letter is attached as Exhibit D.

only on behalf of Prosser, and that Nitron would be shipping the products under the Sales Contract to Prosser in Belize.

38. FCA and Nitron both intended for Nitron to assume a direct obligation to Prosser, such that Nitron would have a duty to compensate Prosser if it failed to perform under the Sales Contract.

39. The Sales Contract required Nitron to ship 2,000 metric tons of AMSUL and 1,250 metric tons of DAP to Prosser. Pursuant to that agreement, Prosser paid Nitron $993,750 for those full amounts.

40. Rather than deliver the quantities specified in the Sales Contract, Nitron shipped only 1,003.756 metric tons of AMSUL and 600.131 metric tons of DAP. The value of those goods, based on the prices stated in the Sales Contract, was only $487,990.75. There is therefore a $505,759.25 discrepancy between the amount paid to Nitron and the value of the goods it actually delivered.

41. Nitron, however, has refused to return these excess funds to Prosser.

42. Prosser has suffered additional damages due to the poor quality of the AMSUL that Nitron shipped.

43. Based on Nitron's breaches, Prosser has been damaged in an amount to be determined at trial, but in no event less than $505,759.25.

## Second Claim
### (In the Alternative - Unjust Enrichment/Implied Contract)

44. Prosser repeats and realleges the allegations set forth in paragraphs 1 through 33, above.

45. In the alternative, Prosser asserts that Nitron has been unjustly and wrongfully enriched to the detriment of Prosser.

46. As described above, Nitron has received over $1 million from Prosser, yet it has shipped products to Prosser valued at merely $487,990.75.

47. Nitron has therefore been enriched in an amount equal to at least $505,759.25, at the expense of Prosser.

48. Nitron appreciates and is aware of the fact that it has been benefitted by Prosser.

49. It would be against equity and good conscience, and inequitable, to permit Nitron to retain these funds without repayment to Prosser.

50. Based on this conduct, Prosser has been damaged in an amount to be determined at trial, but in no event less than $505,759.25.

## Third Claim
### (Violation of Implied Warranty of Fitness for Particular Purpose – UCC § 2-315)

51. Prosser repeats and realleges the allegations set forth in paragraphs 1 through 33, above.

52. At the time of entering into the Sales Contract, Nitron knew that Prosser was purchasing the AMSUL and DAP to be suitable for use in connection with its fertilizer business. Further, Prosser was relying on Nitron's skill and judgment to ship suitable goods.

53. The goods that Nitron shipped, however, were of extremely poor quality, and were unfit for Prosser's business.

WHEREFORE, Prosser request that judgment be entered against Nitron for the relief set forth above, plus interest, costs and expert fees, as well as punitive damages in light of Nitron's conduct.

## Jury Demand

Pursuant to Fed. R. Civ. P. 38(b), Prosser hereby demands a trial by jury of all issues that may be so tried.

Dated: New York, New York
August 14, 2018

OLSHAN FROME WOLOSKY LLP

By: /s/ Michael J. Passarella
Michael J. Passarella (ct28445)

-and-

Adrienne M. Ward (motion for *pro hac vice* admission to be submitted)
Tamara F. Carmichael (motion for *pro hac vice* admission to be submitted)
Joseph B. Weiner (motion for *pro hac vice* admission to be submitted)

1325 Avenue of the Americas
New York, New York 10019
(212) 451-2300

*Attorneys for Prosser*